# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **WILSEY EATON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. CIV-08-103-JHP** |
| | ) | |
| **METROPOLITAN LIFE** | ) | |
| **INSURANCE COMPANY,** | ) | |
| **a foreign insurance company,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Wilsey Eaton ("Mr. Eaton"), filed this action pursuant to 29 U.S.C.§ 1132(a)(1)(B) for determination of entitlement to disability benefits under an employee sponsored disability plan underwritten and administered by defendant Metropolitan Life Insurance Company ("Metropolitan").  Plaintiff contends the denial of his long-term disability benefits by Metropolitan was arbitrary and capricious.

## II.

## The Administrative Record

The record in the instant case has been submitted to the Court and is Bate stamped ML/Eaton 00001 thru 00925.  The document 00925 is a DVD of 58 minutes and 17 seconds of surveillance tape and the rest of the document is a conventional paper document.[1]

1.)  The insurance policy which is the basis of this claim is found on page ML/Eaton 00001 thru ML/Eaton 00045.  The policy reveals Metropolitan both underwrites and administers

---

[1] References  to the Administrative Record are cited parenthetically by page number.

this insurance policy.

2.)     By letter of June 28, 2004, Metropolitan approved Mr. Eaton for long term

disability benefits.  The letter quotes from the policy the definition of long-term disability as

follows:

Definition of Disability

"Disabled" or "Disability" means that, due to sickness, pregnancy or accidental
injury, you are receiving Appropriate Care and Treatment from a Doctor on a
continuing basis and

1.     during your Elimination period and the next 24 months, you are unable to
       earn more than 80% of your Predisability Earnings or Indexed
       Predisability Earnings at your Own Occupation for any employer in your
       Local economy; or

2.     after the first 24 months, you are unable to earn more than 60% of your
       indexed Predisability Earnings from any employer in your Local economy
       at any gainful occupation for which you are reasonably qualified taking
       into account your training, education, experience and Predisability
       Earnings.

       Your loss earnings must be a direct result of your sickness,
       pregnancy or accidental injury.  Economic factors such as, but not
       limited to, recession, job obsolescence, pay cuts and job-sharing
       will not be considered in determining whether you meet the loss
       earnings test.

       For any employee whose occupation requires a license, "loss of
       license" for any reason does not, in itself, constitute Disability."
                                              (ML/Eaton 00639)

3.)     The same letter also states:

**Your plan requires that you apply for Social Security Disability Insurance
(SSDI) benefits.  When you apply for SSDI benefits, please request a Receipt
of Application and mail a copy to our office.  The Social Security
Administration will notify you in writing of their decision.  We will need a
copy of this determination notice."**

The letter granting disability benefits found the benefits  payable as of June 23, 2004,

after Mr. Eaton had met the required 180 day elimination period. (ML/Eaton 00639 and ML/Eaton 00640)(emphasis added).

4.) The Social Security Administration office of Hearings and Appeals Decision is part of the Administrative record. The November 22, 2005, decision sets forth several factual findings including the following: (1) On July 29, 2004, Mr. Eaton filed a claim for disability alleging disability since December 15, 2003; (2) Mr. Eaton is a 49 year old individual with more than a high school education and past relevant work as a skilled computer technician and a quality control inspector, and (3) Mr. Eaton has not engaged in any substantial gainful activity at anytime since the alleged onset. (ML/Eaton 00521- ML/Eaton 00524)

5.) The November 22, 2005, SSDI decision further indicates Mr. Eaton had impairments existing since the onset of disability which the Administrative Law Judge considered to be "severe" under Social Security Regulations. The ALJ specifically noted the following:

> objective medical records (Exhibits 1F-6F, 8F, 12F-14F) show the claimant has a longstanding history of medically determinable severe impairments including dyssomnia, restless leg syndrome, major depression, hypercholesterolemia and allergic rhinitis, each with associated sequelae, as well as mild essential hypertension and sleep apnea being treated with CPAP all with resultant functional restrictions to include, among others - and as was also indicated by the claimant's own testimony, his longtime treating source family physician Kenneth A. Muckala, M.D. - daytime sleepiness causing the claimant to have an inability to drive or operate any sort of machinery, converse, use the telephone or carry on tasks requiring more than 30 to 45 minutes to complete, as well as precluding work not allowing for frequent rest periods and the claimant's being unable to balance, lift, walk or perform repetitive mechanical movements, except for on an occasional basis and at no more than 15 minute intervals, as otherwise set forth by Dr. Muckala in Exhibit 14F, which is incorporated by reference.

6.) The ALJ further finds:

"...the claimant experiences no restrictions of his activities of daily living; no

difficulties in his maintaining social functioning and moderate deficiencies of concentration, persistence or pace, resulting in failure to complete tasks in a timely manner (in work settings or elsewhere);..."

The ALJ's Decision concludes:

"Based on medical evidence from the examining and/or examining (nontreating) sources, as well as the claimant's own testimony, the State agency opinions are no longer fully supported in light of the entire record."

The Administrative Judge ultimately determined that Mr. Eaton had been disabled as defined under the Social Security Act since December 15, 2003. The earliest report of disability was on March 31, 2001, when Kenneth A. Muckala, M.D., Mr.Eaton's primary care physician, reported to Carla Persley of Synchrony Met Life that Mr. Eaton was being seen on that date for the purpose of continued evaluation regarding his chronic sleep apnea and chronic fatigue. Dr. Muckala reported that Mr. Eaton was seeing neurologist Jerome Wade and had appointments with ENT and pulmonology that same week. Dr. Muckala further reported that Mr. Eaton continued to suffer with chronic sleep disturbances, experienced a subsequent inability to concentrate, suffered from sleep apnea, chronic rhinitis, and despite treatment did not get the appropriate amount of sleep. He concluded that Mr. Eaton was medically disabled at that time and should be continued on temporary disability. (ML/Eaton 00682)

7.)     Dr. Muckala referred Mr. Eaton to Ralph W. Richter, M.D., F.A.C.P., who did an initial evaluation on October 9, 2002. His report indicates a history of marked sleepiness since at least June of 2000 and also states that Mr. Eaton gets only a few hours of sleep, awakes and stays up two to three hours before going back to sleep. Mr Eaton reported to him that he was bitten by a brown recluse spider about the time that his sleeplessness began. Mr. Eaton reported he had decreased ability and had to cut back on his work in the computer field which was very

distressing for him. He noted a decreased appetite, decreased energy and an inability to concentrate. He had been taking some medications with mixed relief. (ML/Eaton 00702)

8.) On October 10, 2002, Dr. Richter wrote a prescription stating that Mr. Eaton would be reevaluated and should remain off work until that time and probably longer. (ML/Eaton 00707)

9.) On November 12, 2002, Dr. Richter along with Stephen P. Gruenau, Ph.D., performed a sleep test at the St. John Medical Center. The objective testing found "obstructive sleep apnea syndrome (severe)." The physicians found that " the patient [Mr. Eaton] meets the criteria for severe sleep apnea syndrome experiencing 79 episodes per hour with mild SA02 desaturations." (ML/Eaton 00687 - ML/Eaton 00693)

10) At the end of December 2003, Mr. Eaton began his claim for disability benefits. On December 30, 2003, he signed a form agreeing to reimburse overpayment of disability benefits. (ML/Eaton 00764)

11.) In support of his claim for disability, Mr. Eaton submitted a Physicians Questionnaire signed by his primary care physician Dr. Muckala on January 12, 2004. In the initial questionnaire, Dr. Muckala states that Mr. Eaton is unable to work at this particular time and it is unknown when he will be able to work. Dr. Muckala gives a primary diagnosis of sleep disorder with a second diagnosis of chronic sinuitis. Dr. Muckala lists clinical findings and pertinent laboratory results. (ML/Eaton 00765 - ML/Eaton 00772)

12.) In the January 12, 2004, questionnaire, Dr. Muckala states that Mr. Eaton has a chronic condition requiring treatment, Mr. Eaton needs a leave of absence for treatment, indicates there will be continued treatment and that finds that Mr. Eaton is unable to perform any

kind of work. (ML/Eaton 00770 - ML/Eaton 00772)

13.)     On January 14, 2004, Mr. Eaton was approved for short term disability effective
December 12-17, 2003 through February 2-8, 2004.  (ML/Eaton 00761 to ML/Eaton 00761-
ML/Eaton 00762)

14.)     On February 9, 2004, Mr. Eaton was approved for short term disability from
December 12-17, 2003 through February 2-22,  2004. (ML/Eaton 00737)

15.)     On February 19, 2004, Dr. Muckala sent a letter to Metropolitan stating that Mr.
Eaton was temporarily disabled as a result of his chronic hypersomnia, or dyssomnia sleep
apnea, which does not allow him to work.  (ML/Eaton 00728)

16.)     On February 25, 2004, Metropolitan approved short term disability benefits
through March 4, 2004. (ML/Eaton 00721)

17.)     On March 1, 2004, Dr. Muckala sent another letter in support of short term
disability. (ML/Eaton 00720)

18.)     On March 1, 2004 , a physicians consultant review (Peer Review) was performed
by Amy Hopkins, M.D., M.P.H., Ph.D.  This appears to be an in house review.  Dr. Hopkins
discusses Dr. Muckala's examination and his February 14, 2004, letter which stated that Mr.
Eaton's sleep disorder prevented him from working.  Dr. Hopkins also discussed Dr. Guy,  ENT
who recommended a possible septoplasty with turbinat reduction.  Dr. Hopkins noted, however,
that because there were no tests she could not properly evaluate the claim. (ML/Eaton 00709 -
ML/Eaton 00710)

19.)     On March 04, 2004, Dr. Richter sent Metropolitan a Polysomnographic Measures
Evaluation which demonstrated that on November 2, 2002, Mr. Eaton met the criteria for severe

sleep apnea. (ML/Eaton 00687 - ML/Eaton 00695)

20.) On March 03, 2004, Dr. Richter sent all of his records to Metropolitan. (ML/Eaton 00687 - ML/Eaton 00707)

21.) Michael C. Foster, M.D., a partner doctor of Dr. Muckala, submitted a hand written letter in support of temporary total disability stating he was seeing Mr. Eaton instead of Dr. Muckala. In addition to having the same opinion as Dr. Muckala in regard to disability, Dr. Foster also provided the same diagnosis. (ML/Eaton 00686)

22.) On March 17, 2004, Metropolitan extended short term disability benefits to April 5, 2004. (ML/Eaton 00683)

23.) On April 5, 2004, Metropolitan extended short term disability benefits until April 18, 2004. (ML/Eaton 00672)

24.) On April 08, 2004, the records from Eastern Oklahoma Ear Nose and Throat were submitted. These records indicate that on April 2, 2004, Mr. Eaton was diagnosed with a deviated septum and a septoplasty was recommended. The records also reveal that fatigue was one of the complaints. (ML/Eaton 00677 - ML/Eaton 00679)

25.) On April 14, 2004, Dr. Muckala sent a letter supporting continued temporary disability. In the letter Dr. Muckala states that Mr. Eaton is scheduled for surgery, continues to undergo complete neurological and otolairyngoligical evaluation. Dr. Muckala also relates that Mr. Eaton will continue to be disabled at least 15 to 30 days. (ML/Eaton 00664)

26.) Another sleep study was done on April 27, 2004, by St. Francis Hospital Sleep Disorder Center which was severely positive for obstructive sleep apnea syndrome. (ML/Eaton 00662)

27.)     On April 27, 2004, Metropolitan extended Mr. Eaton's temporary disability to May 14, 2004. (ML/Eaton 00659)

28.)     On May 14, 2004, Metropolitan extended the benefits to May 25, 2004. (ML/Eaton 00656)

29.)     On May 26, 2004, Metropolitan extended the benefits to June 18, 2004. (ML/Eaton 00655).

30.)     On June 21, 2004, a fourth sleep study was performed at St. Francis Hospital with a diagnosis finding that "in summary, the sleep study was positive for obstructive sleep apnea syndrome to a severe degree..." (ML/Eaton 00650 - ML/Eaton 00652)

31.)     On June 24, 2004, Dr. Muckala filled out a Metropolitan long term disability claim form attending physician's statement wherein he stated he was qualified to determine whether or not Mr. Eaton was totally disabled for the purpose of receiving long term disability benefits.  Dr. Muckala diagnosed sleep apnea, sleep disturbance and excessive somnolence.  Dr. Muckala referred to the notes previously sent, checked the box indicating Mr. Eaton was able to function under stress and engage in interpersonal relationships (no limitations).  However, Dr. Muckala found that Mr. Eaton was unable to perform job duties because of excessive somnolence, and noted that he had advised the patient not to return to work. (ML/Eaton 00615 - ML/Eaton 00617)

32) On  June 25, 2004, one of four peer reviews was conducted by R. Kevin Smith, D.O. Dr. Smith's ultimate opinion was that the medical records were consistent with Dr. Muckala's diagnosis.  Dr. Smith also concluded Mr. Eaton had severe sleep apnea which he noted had been diagnosed in multiple studies.  Dr. Smith noted Mr. Eaton had been unable to tolerate C-PAP

and Bi-PAP due to nasal obstruction, and that although Mr. Eaton had the surgical intervention of a septoplasty and nasal turbinate submucosal resection, he continued to experience symptoms. Repeated sleep studies on June 21, 2004, indicated no improvement following the surgery. Dr. Smith concluded, "the sleep studies show a severity consistent with the employee's ongoing symptoms during the day, including drowsiness, falling asleep easily, and difficulty with concentration and focus." (ML/Eaton 00635 - ML/Eaton 00638)

33.) On June 28, 2004, Metropolitan approved Mr. Eaton for long term disability benefits. (ML/Eaton 00639 - ML/Eaton 00640)

34.) On October 28, 2004, Naroun Tawk, M.D., an Assistant Professor of Medicine at the University Physicians Heart Lung and Vascular Center, saw Mr. Eaton for an initial sleep consultation. The consultation was for evaluation of insomnia and excessive daytime sleepiness. After review of Mr. Eaton's social history and after conducting a clinical study, Dr. Tawk assessed Mr. Eaton as follows: (1) very severe sleep apnea requiring at least a pressure 14/10 to overcome obstructive events; (2) persistent excessive daytime sleepiness despite adequate use of the Bi-PAP; (3) insomnia and difficulty maintaining sleep; (4) possible delay sleep phase syndrome versus inadequate sleep hygiene; (5) depression, and (6) alpha intusion."

Dr. Tawk found Mr. Eaton had a very complex sleep problem characterized by serious multiple complications. Again under Dr. Tawk's, Mr. Eaton underwent objective testing, this time a polysomnography which showed a successful C-PAP titration, but short sleep latency consistent with the presence of a clinically significant degree of daytime sleepiness, a history of insomnia and relative bradycardia. (ML/Eaton 00559-00572)

35.) On January 17, 2005, Dr. Smith did another peer review. He noted that Mr. Eaton

saw Dr. Muckala on July 21, 2004, and a referral to psychiatry was recommended. Dr. Smith also discussed Mr. Eaton's visit to Dr. Tawk on October 18, 2004. During the October 18, 2004, visit Dr. Tawk noted several things: (1) Mr. Eaton's many prior sleep studies showing severe obstructive sleep apnea; (2) Mr. Eaton was on a Bi-PAP but continued to have daytime sleepiness and difficulty falling asleep; (3) Mr. Eaton was prescribed Sonata but on December 27, 2004, he was no better, and (4) if Mr. Eaton had returned to work and was unsuccessful, that would add further support for his inability to work at his regular sedentary job as a Help Desk Coordinator. Finally, Dr. Tawk noted there had been no improvement in Mr. Eaton's condition, and he still had significant insomnia and daytime somnolence as well as side effects from the many medications that he had tried. (ML/Eaton 00546 - ML/Eaton 00548)

36.) There are several letters from Metropolitan to attorney Paul F. McTighe, Jr. who represented Mr. Eaton in the Social Security Disability benefit action requesting that Metropolitan be kept informed on the progress of the case. On January 20, 2006, Mr. Eaton wrote the company a letter concerning his initial cash settlement from the Social Security Disability Award, minus attorney fees. On the letter there is a written notation: "Note: 1-22-06 Dr. Muckala's office faxed an I- Form stating Wilsey cannot work due to his disability." (ML/Eaton 00543, ML/Eaton 00540, ML/Eaton 00476)

37.) On June 08, 2005, Dr. Smith was asked to do another physicians consultant review. Dr. Smith noted: (1) he had done three prior reviews on this file and the records revealed multiple significantly positive sleep studies showing severe obstructive sleep apnea ; (2) the titration with C-PAP and Bi-PAP appeared to be successful in the sleep lab although there were earlier indications that Mr. Eaton did not tolerate these treatments, and (3) Dr. Muckala

indicated Mr. Eaton had significant depression.

Dr. Smith was asked to review the updated medical records. His conclusion was that the medical records indicated no significant change in Mr. Eaton's sleep dysfunction and daytime somnolence. Mr. Eaton saw a neurologist and had an extensive neurological work up, was referred to an ENT for possible surgery, but the surgeon did not feel it would be beneficial. Dr. Smith noted the records showed Mr. Eaton tried to return to work on several occasions, but this was unsuccessful, and that Mr. Eaton's employer noted significant somnolence during these trials. Dr. Smith stated the medical records continued to show significant problems with sleep, and daytime somnolence. Mr. Eaton's return to work failed due to significant drowsiness. Dr. Smith found the records indicated Mr. Eaton had severe daytime somnolence and he suggested video surveillance to evaluate daytime activities.

Dr. Smith also indicated that he spoke with the attending physician Dr. Muckala on August 27, 2004. On that date Dr. Muckala stated that in addition to the obstructive sleep apnea, Mr. Eaton had significant depression. Dr. Muckala felt the insomnia was due to a combination of obstructive sleep apnea, and depression. Dr. Muckala observed this was one of the worst cases of obstructive sleep apnea and insomnia that he had seen in his 30 plus years of practice. Dr. Muckala also indicated that Mr. Eaton was seeing a good neurologist and psychiatrist, and overall was doing a little better. Dr. Muckala was certain that Mr. Eaton could not tolerate a return to work, but thought a trial back to work part-time would be reasonable. (ML/Eaton 00527 - 00529).

38.) The record indicates Mr. Eaton saw Dr. Dean in neurology on January 10, 2005, and it was noted that Mr. Eaton had multiple sleep studies which identified sleep apnea, and on

one occasion restless leg syndrome. Efforts of treating Mr. Eaton's depression were not particularly effective. Dr. Dean stated Mr. Eaton was treated with a variety of medications to induce sleep which would work for a time, but Mr. Eaton would rapidly accommodate, and the medications would loose their effectiveness. Dr. Dean indicated he spoke with the Nurse Consultant who stated Mr.Eaton had tried to go back to work on a couple of occasions, but was unable to do so. Mr. Eaton's employer reported that Mr. Eaton had excessive somnolence and that he had sent Mr. Eaton home. (ML/Eaton 00527 - ML/Eaton 530)

39.) On January 4, 2006, Dr. Muckala mailed recent records to Metropolitan. On January 19, 2006, Dr. Muckala faxed the same records to Metropolitan revealing no change in condition. (ML/Eaton 00504 - ML/Eaton 00511, ML/Eaton 00495- ML/Eaton 00503)

40.) On January 23, 2006, Metropolitan sent Dr. Muckala a form to complete. On the form Dr. Muckala stated that; (1) Mr. Eaton has not been able to return to work full time; (2) Mr. Eaton is not capable of performing any other gainful employment; (3) Mr. Eaton is totally disabled, and (4) based on the objective findings which include sleep studies, MRI's, complete laboratory analysis and numerous specialists, Mr. Eaton is permanently and totally disabled. (ML/Eaton 00491 - ML/Eaton 00493)

41.) On February 14, 2006, Metropolitan Life calculated the overpayment of benefits because of the Social Security award and the new monthly benefit reflecting the SSDI offset. (ML/Eaton 00473- ML/Eaton 00474)

42.) On February 23, 2006, Dr. Smith was again requested to do a Physicians Consultant Review. This was the fifth review that Dr. Smith performed. Dr. Smith notes the medical records indicate numerous monthly office visits with Dr. Muckala and the records do not

document any improvement in his sleep apnea, dyssomnia, or restless leg syndrome.  Dr. Smith states that Mr. Eaton continues to have significant hypersomnolence effecting his cognition.  He addressed Mr. Eaton's extensive work up by pulmologists/sleep specialists, neurologists and notes Mr. Eaton has seen a psychiatrist in the past.   Further, Dr. Smith finds the medical records continue to support the claim of inability to sustain gainful employment at any occupation due to problems with hypersomnolence and cognitive changes resulting from obstructive sleep apnea.

Dr. Smith was asked if he recommended neuropsychological evaluation or an IME by another specialist.  The doctor responded that he doubted any neurological evaluation would be helpful.  Although such an evaluation might determine if there was a more significant mental nervous pathology and a better defined cognitive impairment, Dr. Smith was of the opinion Mr. Eaton still had significant obstructive clinical evidence as it related to his physical diagnosis of obstructive sleep apnea and restless leg syndrome which would preclude him from working.  He found **it** unlikely that a neuropsychological evaluation would change the conclusion regarding his work abilities.

Dr. Smith further stated that he had done four prior peer file reviews.  Dr. Smith noted that Dr. Muckala was of the opinion this was one of the worst cases of obstructive sleep apnea insomnia he had seen in his thirty years of practice, and that another file review indicated no significant change in Mr. Eaton's condition.  Further, Dr. Smith found that his last file review on June 8, 2005,  and the new medical records, indicated no significant change with sleep dysfunction and hypersomnolence.  Dr. Smith also documented that Mr. Eaton had tried surgery and other therapies, but none of these had seemed to work.  (ML/Eaton 00466 - ML00469)

43.)     There is a check dated March 28, 2006, from Wilsey E. Eaton made out to Met

Life Disability in the amount of Twenty-two Thousand, Nine Hundred and Nine Dollars and Seventy-Eight Cents ($22,809.78) which represents reimbursement for the overpayment of Social Security benefits.  (ML/Eaton 00464)

44.)     On April 04, 2006, Metropolitan sent a letter to WILSEY E. Eaton stating that "we have received information form your doctors that support total disability from any occupation or gainful occupation as defined by your policy." (ML/Eaton 00461)

45.)     A Met Life Special Investigation Unit Report summarizes an investigation of surveillance which includes fifty-two minutes and thirty-five seconds (52.35) of activity on June 25, 2007.  Mr. Eaton was observed driving a 2000s model gray GMC truck, and traveling a total of 20 miles roundtrip as he traveled to a car wash, post office, an automotive business and a gas station/convenience store.  Mr. Eaton was observed pulling a car hauler loaded with a Toro utility vehicle, lifting and rolling several tires from his vehicle, and bending over and loaded a ramp.   The surveillance tape also shows Mr. Eaton carrying a large package over his right shoulder, dispensing fuel and mowing his yard on a riding lawn mower.   A second video tape on June 26, 2007, which includes approximately twelve seconds of activity, shows Mr. Eaton going outside to pick up his mail.  An additional five minute thirty second video was filmed on June 27, 2007..   Two independent physicians filed reviews after reviewing the film and past medical records and indicated Mr. Eaton did not remain disabled. (ML/Eaton 00421 -ML/Eaton 00422)(ML/Eaton 00389- ML/Eaton 00412).

46.)     On August 20, 2007, Dr. Smith again conducted a Physicians Consultant Review and reviewed two office notes from Dr. Muckala,, two laboratory tests and the surveillance tape. He opined that the medical records did not reveal consistent abnormalities, and that Mr. Eaton

could work. (ML/Eaton 00390 - ML/Eaton 00392)

47.) On October 17, 2007, Metropolitan Life Sent a letter to Mr. Eaton stating that effective as of October 17, 2007, they were terminating his benefits. (ML/Eaton 00343)

48.) On October 22, 2007, Wilsey Eaton sent in his Pro-Se Appeal. (ML/Eaton 00372)

49.) On October 25, 2007, Dr. Muckala sent a letter addressing the surveillance film. The letter gives a description of the medical condition and treatment that has already been outlined extensively. Dr. Muckala further states:

> I did not comment on this private investigator's observations as I have no knowledge as to its' accuracy or intent. According to what Mr. Eaton and his wife tell me, he mows his grass periodically in spurts and has driven his truck as described by the private detective's report. This does not mean that he can work on a regular basis due to his excessive sleepiness, fatigability, depression, restless syndrome, chronic sleep apnea and dyssomnia. In fact, the patient's condition has not meaningfully changed in any way shape or fashion over the past year and a half and perhaps longer. He continues to see me for these conditions on a regular basis though there is little I can do for him except keep him on his current medications.
>
> It is my medical opinion that Mr. Wilsey Eaton, age 51, is totally and completely medically disabled secondary to his chronic dyssomnia, sleep apnea, restless leg syndrome, and chronic depression secondary to the above, with each individual entity not being enough to make him disabled, but together rendering him unable to work more than an hour or so a day intermittently at various times on an irregular basis."

(ML/Eaton 00379- ML/Eaton 00380)

50.) On December 5, 2007, Leonid Topper, a Board Certified Neurologist rendered a peer review stating that "from a neurological point of view, the medical information does not support functional limitations beyond 10/18/2007." (ML/Eaton 00349- ML/Eaton 00354)

51.) On December 6, 2007, a peer review was done by Leonard Sonne, M.D. As part of his peer review he talked to Dr. Muckala's AP who noted that Dr. Muckala had been

following the claimant for about five years, and that "Mr. Eaton has sleep apnea and hypersomnia and frequently has to be awakened in the examination room.  He is lethargic and depressed and has restless leg syndrome. He can only sleep for a few hours at a time, he drives an automobile but not far, he has been referred to many physicians, he was caught mowing his grass and driving under surveillance video but according to the AP he is too sleepy to work." Dr. Sonne concluded, however,  that the medical documentation did not support a claim of disability beyond October 18, 2007. (ML/Eaton 00355- ML/Eaton 00360)

52.)     On February 7, 2008, a final denial letter was sent to Mr. Eaton which exhausted his administrative remedies.  (ML/Eaton 00333)


## STANDARD OF REVIEW

The Plan confers discretionary authority upon Metropolitan to determine eligibility for benefits and accordingly ERISA's arbitrary and capricious standard of review applies.  *Firestone Tire and Life Insurance Company v. Bruch, 489 U.S. 101, 155 (1989).*  However Metropolitan also operates under a structural conflict of interest.  Therefore, the court must weigh the conflict of interest "as a 'factor in determining whether there is an abuse of discretion.'" *Fought v. UNUM Life Ins. Co. of Am., 379 F.3d 997, 1003 (10th Cir. 2004)(quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115; see Metropolitan Life Insurance Company v. Glenn, ___U.S. ____, 128 S. Ct. 2343, 2350  (2008).*

Both parties agree that *Glenn* changes the approach of reviewing a denial of benefits by a conflicted administrator.  Both parties also agree the "sliding scale" approach to a conflicted administrator's denial as enunciated in *Chambers v. Family Health Plan Corp, 100 F. 2d 818*

*(10ᵗʰ Cir 1996)* and the shifting of burden approach set out in *Fought v. Unum Life Ins. Co of Am.*, *379 F2d 997 (10ᵗʰ Cir 2004)* are superceded by *Glenn.*

The ultimate decision in *Metropolitan Life Ins. Co. v. Glenn* is that a conflict of interest is to be considered a factor in determining whether or not there was an abuse of discretion. In doing so, the Court made an important holding which supports both parties' position that the "sliding scale" and shifting burden of proof approach are rejected as proper ways to review under the arbitrary and capricious standard. The Supreme Court states:

> Neither do we believe it necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict. In principle, as we have said, conflicts are but one factor among many that a reviewing judge must take into account. Benefits decisions arise in too many contexts, concern too many circumstances, and can relate in too many different ways to conflicts-which themselves vary in kind and in degree of seriousness-for us to come up with a one-size-fits-all procedural system that is likely to promote fair and accurate review. Indeed, special procedural rules would create further complexity, adding time and expense to a process that may already be too costly for many of those who seek redress.

*128 S. Ct. at 2351; see also, Holcomb v. UNUM Life Ins. Co. of America, ____ F.3d ____, 2009 WL 2436673 (C.A. 10 (Okla 2009))(Glenn expressly rejects and abrogates the shifting burden of proof to a plan administrator to establish the denial of benefits was not arbitrary and capricious.).*

*Glenn* embraces instead a "combination-of-factors method of review" that allows judges to "take account of several different, often case-specific, factors, reaching a result by weighing all together." *Id.* A conflict "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision ... [and] should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy ...." *Id.*

## APPLICATION OF *GLENN* TO THE PRESENT CASE

The majority opinion in *Glenn* cited the Court of Appeals' opinion, *Glenn v. Metropolitan Life Ins. Co.,* 461 F2d 660 (C.A. 6 2006), as illustrative of the "combination-of-factors" method of review. The Court found the record revealed little about MetLife's efforts to ensure accurate claim assessment, and noted that although the Court of Appeals gave the conflict some weight, the opinion did not suggest the conflict alone would be determinative. The Supreme Court emphasized the Court of Appeals instead focused more heavily on factors other than the conflict of interest. In discussing the Court of Appeals opinion, the Supreme Court stated:

> The Court of Appeals' opinion in the present case illustrates the combination-of-factors method of review. The record says little about MetLife's efforts to assure accurate claims assessment. The Court of Appeals gave the conflict weight to some degree; but its opinion suggests that, in context, the court would not have found the conflict alone determinative. See 461 F.3d, at 666, 674. The court instead focused more heavily on other factors. In particular, the court found questionable the fact that MetLife had encouraged Glenn to argue to the Social Security Administration that she could do no work, received the bulk of the benefits of her success in doing so (the remainder going to the lawyers it recommended), and then ignored the agency's finding in concluding that Glenn could in fact do sedentary work. See *id.,* at 666-669. This course of events was not only an important factor in its own right (because it suggested procedural unreasonableness), but also would have justified the court in giving more weight to the conflict (because MetLife's seemingly inconsistent positions were both financially advantageous). And the court furthermore observed that MetLife had emphasized a certain medical report that favored a denial of benefits, had de-emphasized certain other reports that suggested a contrary conclusion, and had failed to provide its independent vocational and medical experts with all of the relevant evidence. See *id.,* at 669-674. All these serious concerns, taken together with some degree of conflicting interests on MetLife's part, led the court to set aside MetLife's discretionary decision. See *id.,* at 674-675. We can find nothing improper in the way in which the court conducted its review."

*128 S.Ct. at 2352.*

Through adoption of the Sixth Circuit's approach concerning judicial review of an ERISA denial, the Supreme Court takes the position that all of the evidence should be taken into account when determining whether or not a denial was arbitrary and capricious. The Supreme Court made the following observation:

> Finally, we note that our elucidation of *Firestone's* standard does not consist of a detailed set of instructions. In this respect, we find pertinent this Court's comments made in a somewhat different context, the context of court review of agency fact-finding. See *Universal Camera Corp., supra*. In explaining how a reviewing court should take account of the agency's reversal of its own examiner's factual findings, this Court did not lay down a detailed set of instructions. It simply held that the reviewing judge should take account of that circumstance as a factor in determining the ultimate adequacy of the record's support for the agency's own factual conclusion. *Id.,* at 492-497, 71 S.Ct. 456. In so holding, the Court noted that it had not enunciated a precise standard. See, *e.g., id.,* at 493, 71 S.Ct. 456. **But it warned against creating formulas that will "falsif[y] the actual process of judging" or serve as "instrument[s] of futile casuistry." *Id.,* at 489, 71 S.Ct. 456. The Court added that there "are no talismanic words that can avoid the process of judgment."** *Ibid.* It concluded then, as we do now, that the "[w]ant of certainty" in judicial standards "partly reflects the intractability of any formula to furnish definiteness of content for all the impalpable factors involved in judicial review." *Id.,* at 477, 71 S.Ct. 456."

*128 S.Ct. at 2352 (emphasis added).*

Therefore, a court must look at all of the evidence and determine if the denial was "the product of a principled and deliberative reasoning process." *128 S.Ct. at 2355.* As noted in *Glenn*, "MetLife failed to acknowledge the contrary conclusions reached by the Social Security Administration, gave scant weight to contrary medical evidence supplied by Dr. Patel, and neglected to provide its internal experts with Dr. Patel's reports." *Id.* The Court concluded that under those circumstances, the Court of Appeals was justified in finding an abuse of discretion wholly apart from MetLife's conflict of interest. *Id.*

In the instant case, the failure of Metropolitan to exercise its right to an IME evaluation is

an important factor in determining if Metropolitan's decision to deny benefits was "the product of a principled and deliberative reasoning process," and reflects its' interest in an accurate claim assessment. *Id.* Specifically, Dr. Smith was asked if he recommended a neuropsychological evaluation, or an IME by another specialist, in his February 23, 2006, peer evaluation. Dr. Smith responded that he doubted a neurological evaluation would be helpful. He opined that although such an evaluation might determine if there was a more significant mental nervous pathology, or a better defined cognitive impairment, Dr. Smith was of the opinion Mr. Eaton still had significant obstructive clinical evidence as it related to his physical diagnosis of obstructive sleep apnea and restless leg syndrome which would preclude him from working. He found **it** unlikely that a neuropsychological evaluation would change the conclusion regarding Mr. Eaton's work abilities.

Further, at the point in time when Defendant decided to do a surveillance video, the record contained continued and unequivocal support of Mr. Eaton's disability from his treating doctor, objective medical testing supporting disability, five peer reviews that supported disability and a statement in the last peer review that an IME would further support a disability determination. Finally there was a determination of disability by the Social Security Administration which has benefitted MetLife significantly.

In the case of *Brown vs. Hartford Life Insurance Company*, WL5102279 (C.A.10 Okla.(2008)), the Tenth Circuit recognized that *Glenn* changed the way the evidence should be viewed in ERISA cases in a very practical way. In upholding the denial of benefits, the trial court gave weight to the disability awards by the Social Security Administration and the Oklahoma Workers Compensation Court that was typical of such reviews prior to *Glenn* and in

accord with prior Tenth Circuit precedent.  In reversing the decision, the Tenth Circuit noted:

> While authority from this circuit generally supports the district court's approach, *see, e.g., Caldwell v. Life Ins. Co. of N. Am.,* 287 F.3d 1276, 1284 (10th Cir.2002) (rejecting administrator's reliance on Social Security and workers' compensation determinations where disability standards differed from those in private policy), we find more pertinent the Supreme Court's recent, specific comments on this issue in *Glenn:*

> 1. [T]he [Sixth Circuit Court of Appeals] found questionable the fact that MetLife had encouraged Glenn to argue to the Social Security Administration that she could do no work, received the bulk of the benefits of her success in doing so (the remainder going to the lawyers it recommended), and then ignored the agency's finding in concluding that Glenn could in fact do sedentary work. This course of was not only an important factor in its own right (because it suggested procedural unreasonableness), but also would have justified the court in giving more weight to the conflict (because MetLife's seemingly inconsistent positions were both financially advantageous).  *Glenn,* 128 S.Ct. at 2352 (citation omitted).

*Brown v. Hartford Life Ins. Co.* (C.A.10 (Okla.)(2008)).

On remand the Circuit Court directed the trial court to apply the "combination-of-factors" method of review and consider Hartford's inherent conflict of interest, as well as Hartford's summary rejection of the decision of the Social Security Administration finding Mr. Brown disabled.  Further, the trial court was directed to consider any financial benefit that Hartford derived from those determinations, and the opinions supporting disability and the reasons for Hartford's objections to those opinions.

Applying this standard to the instant case, the court can find no reason for Metropolitan's rejection of Dr. Muckala 's opinion supporting disability.  This is particularly true when Dr. Muckala submitted fourteen letters, or physician's statements supporting disability and the Defendant accepted twelve of them as proof of disability as evidenced by the initial payments.  Further, numerous additional factors, when viewed in combination, convince the court Metropolitan's decision to terminate payments was an abuse of discretion: (1) After MetLife

accepted the medical documentation in support of disability for a period of two years and nine months, with no evidence the medical condition had changed, and after receiving continued medical reports stating the condition remained the same, MetLife reversed its decision of disability; (2) The Defendant is operating under a conflict of interest; (3) The Defendant received over Twenty-Two Thousand Dollars ($22,000.00) because of the Social Security award, encouraged and monitored the request for the Social Security benefits, then gave little, if any, consideration to the ALJ's award in its denial; (4) The Defendant does not exercise it's right to conduct an independent medical evaluation in light of the fact their own physician told Metropolitan the independent medical examination would simply validate the claim of disability; (5)There is no evidence to counter the objective medical findings that supported the two and a half years plus of disability payments, and (6) The surveillance tape is the only evidence in support of the denial and is discounted  by Dr.  Muckala.

Accordingly, based upon a "combination-of-factors" analysis, the court finds Metropolitan's decision denying benefits was an abuse of discretion.

DATED the 25th day of September, 2009.

James H. Payne
United States District Judge
Eastern District of Oklahoma